by Paul Feinstein and Michael Liszka, accounted by James Murphy. Good morning, Your Honors. Justice Litton, Justice Wright, Justice McDade, Jim Murphy on behalf of Michael Liszka. Also today with me is Laura Malinowski, co-counsel, and Mr. Liszka is sitting in the back of the courtroom. Your Honor, this is sort of a dense brief with a lot of numbers that I'm probably not going to go that much into. However, what I'd like to start out with is just what the requirement is under the statute at the time of the trial for dissolution and determination. And it provides that valuation was supposed to be as of the date of the trial or some other date as close to that date of trial as is practical. In this case, the trial began on October 21, 2013. The trial finished December 9, 2013. It was conducted intermittently, as many bench trials are. However, the judgment was entered on April 16, 2014, and the dissolution of marriage was entered on March 25, 2014. The valuation, however, went back almost two years to December 31, 2011. This is also a payment company, ISP, which is the main asset of the marriage. And this was after the recession. Revenues during that time went from 2011 of $6,183,000 for the company to projected revenues in 2013 of $8,187,000. We've taken a number of pages. We've gone through the valuation, used the same type of valuation that Ms. Liska's expert used to come up with a valuation of about $4 million, which was about $3 million more than Ms. Liska's expert came up with. Now, there are a number of things that we go into the dates. The revenue shows the changes. The courts have recognized the changes, and, of course, the law recognizes that it should be done as close to the trial. And the Illinois Supreme Court has talked about doing it in terms of the trial. It is the date of the dissolution. So if there's a bifurcated trial, and I would suggest probably the best way of doing this thing, and many things were not done correctly, I'd say, in this case, but would be to bifurcate it, have the dissolution in a case like this where there are many issues in terms of valuation. Were you trial counsel? I was not trial counsel. Did trial counsel ask for a bifurcated dissolution? Trial counsel did not ask for a bifurcated dissolution. So isn't that point moot? Well, no, I think just in terms of talking about what would be good to do. In that sense, it is moot in terms of what could have happened. There are many things that could have happened. We're dealt with what did happen. And the main thing that did happen, when we're talking about... So let's go back and focus. This was not a bifurcated dissolution. What date do you think should have been used for valuation? I think the valuation date then should have been the date at least the trial began, October 21, 2013. And how long did it take to do the valuation? How long was the process? In the case of our client, the expert, the documents were... How long did it take for the wife's expert to value the business? That I don't know. There's not a record on that, but it was done by the end of 2012, I believe is the date of the report. Our expert compiled a report within two months of getting all of the documents. Now, one of the things that happened is the documents were not produced that were needed for the valuation until the beginning of August 2013, going up to October of 2013. And I call your attention specifically, there's a reference in the record to 4,000 pages of documents being produced. However, on August 29th, I believe it is, Ms. Liska's attorney that was in charge of discovery sent an email recognizing that they were then producing documents 579 through 1,860. That means up until that point in time, only 578 documents of the 4,000 had been produced. Those had been produced in redacted form, so not all the information was available. They started being produced two months before the trial, after the cutoff for disclosure of expert witnesses under rule. So, with regard to borrowing the expert witness, we believe, first of all, it was improper because the cause of any delay was not due to Mr. Liska. It was due to Mrs. Liska. And even if there should have been some sort of sanction, borrowing an expert testimony in a case like this is far more severe than is justified. I call your attention to this court's case, third district, Besco versus Hensley. And there the court set out questions of what should occur, what standards should be looked at in terms of borrowing a witness. And the court then said, should look at the surprise to the adverse party. Here, there really was no surprise. The parties knew that valuation was at issue. The name of the expert had been disclosed prior to the cutoff. And the nature of what was going to be testified was disclosed prior to the cutoff. The next thing to look to is the prejudicial effect of the expert's testimony. Well, here what we have is no testimony at all. In fact, Mr. Liska then tried to testify using basically the same methodology that Ms. Liska's expert had used. And the court found that was not credible, in part because he wasn't an expert. And yet he was using the updated financials. That's what he was left to. So the prejudicial effect was great in this case. The nature of the expert's testimony. Again, we go to the valuation of the company, which is really the heart of the marital assets in this case. And really, the ultimate impact on Mr. Liska is probably about $1.5 million. You know, when we talk about business cases, I think we have a tendency to forget what dollars mean. You know, I'm getting closer to retirement. And I think about what $1.5 million would mean. It would mean the difference between retiring and perhaps working another seven years. You know, so these are real dollars, real money. You know, and the issues are sometimes I think as lawyers just forget sort of what kind of impact that has. The next item to be considered is the diligence of the adverse partner. Now, here we don't have a perfect record. We don't have perfect performance by anybody. Kathleen didn't present the documents on time. Michael's attorney filed a motion to compel. Ms. Liska was given time to brief it. It was set for hearing. It was continued a number of times. And there apparently was no hearing on it. Should Mr. Liska's attorney have been more argumentative, more forceful in pushing the issue? Perhaps. But what we have here is a situation where two parties perhaps didn't perform as one would ultimately love to have happen, but yet the penalty falls on just one party, Mr. Liska. Now, what could the court have done? The court could have granted some sanction, could have delayed the trial. Again, this was a bench trial. But let's go back first to the other points that Vasco mentioned. Whether the objection to experts' testimony was timely. Here, Kathleen Liska's attorney, she was aware of when the disclosure was made, the adequacy or inadequacy of it in August when their expert was first disclosed. There could have been an objection at that point in time after the time for disclosure had run. But Kathleen Liska waited until the day of trial to make any objection. Again, is it optimal? No. Many things are not optimal in this case. But the question is where should everything fall? Finally, could Michael have cured if she had made the objection in August? Well, I think it would have brought to the court's attention what the issue was. And I think it would have brought to the attention that the documents had not been produced yet. He was still waiting for the documents. Those were needed for his expert's opinion. And it's hard to tell exactly what would have happened, but certainly at that point in time I think the trial judge would have been more likely to continue the trial or perhaps look at bifurcating. One of the other things with the trial date was that the custody had not yet been determined. And that is required to be done within 18 months. That's why the trial date was set at that point in time. But it could have been bifurcated at that point in time. On request of the parties? Yes, on request of the parties. Yes. No, no, no. I agree. And yet at the same time, it's interesting in dealing with the federal system, the collaborative process is much more in vogue. And hopefully it will find its way and trickle down. And I'm even still sort of struggling with the collaborative process. But dealing with that, sometimes the judges become more involved in the collaborative process also in terms of making sure that a scheduling is set, which was not done in this case, and at least keeping tabs on where the case is. Didn't this case begin with both husband and wife agreeing on who the expert should be to value the business? No, no. That was during the collaborative process when they were looking at it. When the collaborative process began, was there an agreement that this expert should be sought out? I think there was an agreement that an expert should be sought out. Didn't Michael and his attorney meet with Ms., I don't know, I'll call her Ms. Z? Yes, yes. Didn't Michael produce some records for her to use? She did produce some records, but that was at a time that his expert had been barred. And frankly, he was trying to hail Mary at that point in time. That isn't what it sounded like from the briefs. It sounded like there was a period of about a year and they were actually cooperating and that they had one expert between them. But what I was talking about was when, I think Justice Wright is talking about when they met with her later, after the expert was barred. There was a collaborative process time where they were using that expert, but collaborative process broke down. And certainly during that collaborative process time, we're talking about a year and a half before, which evaluation would have been much different also. Now that's one of the other things that happens. Actually, I was speaking about, just relying on the brief, it sounds like a draft report was prepared when things were still collaborative. Well, in the collaborative process, yes, I'm sorry. And I thought you were referring to a later point. I think Justice McDade and I are on the same page. Okay. But in any event, that was for a much earlier point in time, and you're looking at the date of the trial is when the evaluation date is supposed to be set. After sharing the draft document, then there was a disagreement, I think, as to certain normalization adjustments? Yes. And that's where things broke down? Things broke down. So you know when that point in time was? That would have been, and these are some of the details, not being the trial attorney, I don't recall exactly, but I believe it was about a year into it, between a year, year and a half. I think it was toward the beginning of 2013 when other types of discovery got going in earnest. Two minutes, please. One of, and I'll have to rely on the briefs for most of it, the remaining issues, two matters I want to bring up are the imputation of income was based solely on expenses that were being paid from Mr. List's retirement accounts. They were not income, even if there should have been some imputed income, that was not a proper basis for imputing the income. I thought the basis was where he was being paid during his period. Well, he was being paid during the period, but here's what you have is that he's being paid during a period, but then he's got imputed income going forward for child support. And the question is, you know, here you've got the owner of a company, a co-owner of a company that all of a sudden doesn't have an ownership in the company and is then required to go out and get a job. Now, there was no evidence in terms of what that employment would be, what he could get,  it was truly based on what his expenditures were, which were being paid for to a large extent out of his retirement account. Are you suggesting he was being paid for not doing any work, that he wasn't contributing to the business? I think there was a portion of a period of time where Mrs. Liska said, basically, you can't be here, but we'll continue to pay you. Before that. Oh, no, before that, he founded the business. He was responsible for creating much of it. No, he was entirely. He was being fairly compensated. He was being fairly compensated at that time, yes, yes. But there's a significant difference, I think,  that has started many years before in what you could do either in a startup business or getting a job from somebody else. Do you know why he was only a 49% owner? I do not know for sure, but if I were to hazard a guess, I would expect that when you're talking about certain jobs being let, whether it's minority or women, there's some benefit to have a majority holder being either a minority or a woman. I suspect that was the reason. We're out of time. We're out of time. Thank you, officers. Good morning, justices and counsel. My name is Paul Feinstein, and along with Kelly Marks, we represent Kathleen Liska, the appellee. Justices, I just heard some argument as to what could have been done at the trial. I didn't hear anything about the appropriate standard of review regarding this case, and the 12 issues that were raised, and particularly a couple that were discussed by counsel. After a long trial, specific findings made by not one but two judges, who became very familiar with parties, made detailed credibility findings. I would start where counsel did with respect to the business valuation and the borrowing of the witness, and, of course, with respect to the standard of review, the issue becomes, would one reasonable person agree that the trial court handled this situation? It wasn't the trial court's fault. This is what came onto his lap, as it were. Was it a reasonable ruling under the circumstances? I think clearly that it was. You have a mandatory Supreme Court rule, Rule 213, that was not complied with by Michael. He was served with Rule 213 interrogatories 18 months before the trial. He didn't even disclose Ms. Holford until 60 days prior to the trial, and all he disclosed, essentially, was a little paragraph that's in the record, a sentence about her qualifications, saying that she was going to value ISP, nothing in terms of any documents, any bases, any value. And, again, this was 60 days prior to the trial. And remember, we didn't have motions to continue by Michael until the day of trial. We didn't have a motion to extend the time to issue the report. There was a motion to compel some discovery, which Michael didn't push, and ultimately the trial court did have a hearing on discovery. There was testimony at the corporate council as to what was turned over, when, and why, and what was redacted, and all that was redacted was names, because there was a concern that Michael was going to poach clients and customers. There weren't any numbers. There was nothing filed by Michael. There was a ledger that was not filed until one of the last five. It was closed until one of the last five. There were certainly, there were ledgers before. I mean, Ms. Zeusius's report, which had everything, was issued in December 2012. Keep that in mind. And the trial court heard all this and said that there was no reason to continue the trial. There was no basis not to bar the witness in this case, that Michael didn't exercise due diligence. Michael's lawyer at the trial even conceded that it would be prejudicial. Keep in mind, Kathleen's counsel gets this report finally from Ms. Hofer two days before the trial. The trial's been set for, what, eight months. The valuation of Ms. Zeusius was done December 2012, and two days before trial in October we get a business valuation. What's the trial judge to do other than to bar the witness? There were some issues that were resolved by agreement prior to that date involving custody, correct? What happened is that the custody trial, Justice, actually started on that Monday, and then it resolved at that point. And so Michael's position is, well, now that we've resolved custody, we can continue the finances and we can start over and do a report. What was his source of income during the pendency of this trial date, this hearing? He was being paid by the business. He was on administrative leave for, like, two years. He was making about $210,000, and I think at some point he also got a $500,000 pre-distribution, which I think he used to buy a house. So that income would continue if the trial had been continued? I'm not certain as to what the basis, whether it was an order or whether it was just something that ISP was doing. So there wasn't a specific request to continue that. But there was that possibility, obviously, that the business would have to continue to be depleted to pay somebody who wasn't doing the work. Do you agree that the valuation should be done as closely as possible to the date of dissolution? The statute actually says, Justice, as close to the date of trial as is practicable. This whole argument about the date of the judgment is a red herring, because that was Mather. That was a bifurcated case. That is not this case. You have a case here where the report was already done in 2012. The trial dates were set. The trial judge didn't want to start over and then have new dates. And, in fact, Ms. Zuzius had testified why the report was issued December 2012, but the evaluation was December 2011. And she indicated the financial statements had not been finalized early in 2012. It took a long time to get them finalized. And she said, and all of the parties were anxious to get this done, and nobody wanted to wait until early 2013 to have 2012 records. And she referred to both parties. Again, this was something of a collaborative situation, where, again, as you indicated, Justice, there was a draft. Ms. Zuzius met with Michael and counsel. He suggested some changes. The changes were made. And then, on top of that, at the trial, Michael's counsel, without the knowledge of Kathleen or her lawyers, sends to Ms. Zuzius the 2012 and 2013 figures saying, well, why don't you update this for us? Trying to make them, again, per witness. And Ms. Zuzius testified that didn't change her opinion. And that's something counsel was admonished for. It probably got off easy on that. My notes show the date of evaluation was January 31st of 2011. I might be wrong, but that seems to line up with the fact that there weren't any 2012 business records taken into consideration. Right. December 31st, 2011, Justice, I think is the actual date. Yes, and when she got started on the project, she didn't have 2012. She needed to finish it. It needed to be disclosed so that discovery could be done. You have to keep in mind these business valuations and the discovery, they take several months, which is why Kathleen's lawyers didn't have any time, even if they had Ms. Hofer's name, which is all they had 60 days before. Under Rule 218, discovery with respect to experts is supposed to close. It's supposed to be done before 60 days prior, and we didn't even have a name and address. And Kathleen did object because she had to go to court on this. They had to get an order disclosing Michael and his counsel to give names and addresses, at least for a whole bunch of witnesses, including Ms. Hofer. When the valuation was finished on January 31st of 2011, what was the impending trial date at that time? The report was done December 2012. The valuation date was December 31st, 2011. The trial date had not yet been set, but I believe it was set in April for October, and it was going to be until it's finished. And so several months were blocked out. The court had all that time. Counsel, the parties, had all that time blocked out. So when counsel says, well, the court could have continued the trial, the court could have continued the trial but felt that it wasn't appropriate for that court, who would then be sitting there with weeks of nothing to do because he'd cleared his trial calendar. He had expected to try this case. This case was ready other than Michael being ready, and the trial went ahead. And I believe that at least one reasonable person could say a trial judging that circumstance did the right thing. And that's the issue, not what could have been done or should have been done. When did the collaboration break down? The collaborative process break down? It was about, I think there was a year of collaboration, Justice, and I don't know if there is actually a date in the record where it would say it, quote, unquote, broke down. Subsequent to that, they still were working together with Ms. Zuzia, as it were, and that's an aspect, as I understand it, of the collaborative practice. I, too, like counsel and just sort of getting into it, just got trained and maybe understand half of it at this point. So you were not trial counsel? I was not. If the records, the financial records, were totally in the control of your client, didn't she have some obligation to update? That's what was being done, though, as the record indicates. There were many requests by Michael's counsel, most of them informal. There were letters, e-mails going all over the place, and there was substantial and periodic updating going throughout, which is in the record. And then, ultimately, when the hearing came up, the court said, you know, this was enough. There were also some negotiations that had to be done dealing with a protective order, because, again, Michael was complaining about the redactions, and ultimately a protective order was entered, and then at that point documents were turned over. They were unredacted. But there was never a valuation that was updated from December of 2011? There was to the extent that, again, in the middle of the trial, Michael and his prior counsel, Mr. Rowe, gave certain financials to Ms. Zuzius from 2012 and 2013 and asked her, essentially, to update the valuation, and she said that it wouldn't change her value. Is that in writing somewhere? It is. It is. It's in her testimony. My reason is that she didn't say it would change her testimony, but she couldn't really do what she needed to do to update her changing testimony in the time she had to do it. Well, there were time issues. There were some issues as to the legitimacy of the records. I mean, she did have some issues with respect to that, and you have to keep in mind, again, this is thrown at the witness in the middle of trial. She had already done a valuation that took her, obviously, several months to get done at the end of 2012, and that's what she went to court and testified over. What was the question about the legitimacy of the records? She had said, I believe, there were some mistakes, there were some inconsistencies, there were some things that didn't make sense. But even so, the bottom line is she said, this doesn't change my opinion as to the valuation of this business, and the trial court accepted that. Those were records that were generated while Michael was on administrative leave? Yes. Yes, they were turned over by him or, I believe, by his counsel. There was an issue as to some e-mails sent, and there was a whole hearing as to that, where Mr. Rowe admitted he made a mistake and he shouldn't have done it, and the court slapped his wrist. So there was a fairly rigorous cross-examination with the new figures that Michael propounded regarding income? Yes, all this was going into it. I mean, you had a lot of detail, the report itself, the documents, the examination, the cross-examination. I mean, this is not a situation where a value is given of something like zero or $10,000. It was still a substantial value of $1.1 million for this asset. Thank you. I'd just then like to touch on the imputation, which is sort of a conflating of two issues. Number one, I mean, we know it's abuse of discretion under Gosney, and there was a lot of evidence and findings made by the court that Michael had the two years on administrative leave, he was making $200,000, and his efforts were insufficient, in the court's opinion, to get himself back up to where he should have been. And the loss of the job was also, as indicated, due to his conduct with respect to the sales tax and the other things. And he also infers that he went on interviews, but if you look closely at the examination, he didn't really go on interviews. He went out with some of these people and asked them very general questions. Now, the McGrath issue, which he tries to conflate with this, and I'm always happy to talk about McGrath because that was my case, but it really doesn't apply here. That was de novo as to what is income. This was an imputation of income under Gosney and under the Marriage Act. And even so, you do have the Eberhardt and Linden cases that indicate that IRA distributions are probably called income. It is money that becomes available. But, again, it's a red herring. There were, like, three issues where he said it was de novo, but if you look at each one, it's abuse of discretion or manifest weight. I'd otherwise stand on my brief. Unless the Court has any other questions, I respectfully ask the trial court to be affirmed. Thank you. Thank you, Mr. Pines. Mr. Murray and Henry Bowman. What Ms. Zuzius stated, and we have in our brief, is that she was unable to give an opinion with a reasonable degree of accountancy certainty as to the value of the ISP for December 2012 or October 2013. So she did not opine with regard to that. So the cross-examination would have been basically an admission, I can't give you a date that's required by the statute. With regard to the discovery, counsel made some degree of it in terms of it being informal. Well, that's what's required by 201K. You're supposed to try to have a collaborative process. It's supposed to be informal. Again, could it have been pushed? Yes. But the question is, when these documents were not being given as they were required to be given, do you put all of the sanctions on one party? With regard to the child support, in terms of the imputation of income, I just want to clarify that that occurred six months afterwards. So at that point in time, Mr. Liska was not still receiving the income from the company. With regards to whose expert it was, I think it was interesting that Mr. Liska was admonished for talking to the expert. Now, if it was Mr. Liska's expert, why would that have occurred? Admonished by whom? By the judge. When did that happen? For talking to Zuzius? For talking to Zuzius. That was around the time of the trial after his expert had been barred. No admonishments before the trial date? No. No, because at that point in time, there was a gap where he was trying to get documents for his expert. So, again, this is not optimal. What prevented him from giving those 2012 projections or documents, excuse me, documents to Ms. Zuzius? He did not have those in redacted form. He had the 2011. The 2012 he did not have. He was not there at the company. What was redacted when the documents were finally produced? My understanding is that redaction was a lot. Were the numbers redacted? I don't think numbers were redacted, but without the information that went along with it, it was very difficult to tell how those things line up. Certainly, the most recent information had not been produced. Was there any allegation of fraud or misrepresentation in the documents that were produced? No, I don't believe so. The only omissions that he did not have that were redacted had to do with the names and not the numbers. Well, what I also know is the quantity of what was produced. There was, prior to August, and this goes back to Mr. Starkman's email, prior to August 29, 2013, only 570-some documents had been produced. The balance of the 4,000 pages of documents were produced after that date. It seems to me there would be plenty of information in there that was required and needed. Well, have you gone through the 4,000 pages? I have not. So have you compared the information that was in the 570 pages to the information that was subsequently produced? Because the 570 pages could have been a concise summary of business records. It could have been. And I don't know. And I don't know. And this is, unfortunately, one of the parts of the record that is less than full. Again, I would wish things were otherwise. I wish some things had been done differently by all parties and by the judge. But the question is what is the appropriate thing to do and was there truly a fair trial for the current value when the trial was in 2013 to do evaluation based on 2011? Especially when we know that there was increase in revenues, we know what the economy was happening and sort of the downturn and then hopefully the constant rise after that. And this is a painting business, something that is unique somewhat to real estate. So it's not surprising that there has been a change or would be a change in it. And this goes to a basic question, we believe, of fairness, Your Honor, and what the appropriate remedy and appropriate sanction. What do you think would happen if we agree with you today? What are you hoping the remedy would be? I think it would have to be remanded for a trial on valuation back in 2013. Are you requesting re-litigation of the imputed income issue? Well, yes, we are because that, the imputed income amount, we think was inappropriate based on what it was set up. So if that door is open, will the trial court be allowed to consider what income he has now, which is some three years later? I assume he's very gainfully employed. And I guess I haven't thought about that. And the reason, and I'm not sure because that goes to a different issue, which is not custody but child support. And so my sense is that you would be able to, because it is child support, my sense is that is different and probably would be able to look at income up until today. But that is a question that I, frankly, have not quite considered. Thank you, Your Honor. Thank you, Your Honor. And I do thank both for your argument today. We will take this matter under advisement. The bench has a written decision within a short day. We'll now take a short recess. Please rise. Support stands in recess.